**George C. KOPP, Administrator of the Estate of Thomas P. Thomson, Deceased, Appellant,**

**v.**

**Margaret K. THOMSON and Nona E. Thomson, Respondents.**

**No. 44259.**

Supreme Court of Missouri.

Division No. 1.

March 14, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied April 11, 1955.

R. B. Caldwell, Stanley Garrity, Robert S. Eastin, Scott R. Timmons, Caldwell, Downing, Garrity & Eastin, Kansas City, for appellant.

David M. Proctor, Jr., Paul S. Kelly, Kansas City, for respondents.

COIL, Commissioner.

The second appeal in this case is from the judgment of the circuit court affirming the probate court's action denying appellant-administrator's application for a refund made pursuant to the provisions of Section 465.400 RSMo 1949, V.A.M.S. The former case is Kopp v. Thomson, 362 Mo. 1043, 246 S.W.2d 791, 29 A.L.R.2d 1239.

George C. Kopp, Administrator of the Estate of Thomas P. Thomson, deceased, filed an application on March 9, 1950, to obtain the probate court's order directing Thomson's heirs to refund to the estate the sum of $50,000 received by them on or about November 22, 1932 ($12,500 to each of the four heirs) as partial distributions. The stated reason was that there were not sufficient assets remaining in the estate to pay the claim of the assignee of creditor Pryor. The averments of the application were set forth in detail at page 792 of our former opinion. We held on the first appeal that the circuit court erred in affirming the judgment of the probate court dismissing the administrator's application on the ground that it showed on its face the administrator's laches; that, while the application showed that 18 years had elapsed between the partial distribution (November 1932) and the filing of the application (March 1950), and that 12 years had elapsed between the time when the amount and validity of the Pryor claim were finally established, nevertheless, because Section 465.400, supra, permitted the filing of a refund application at any time before final settlement; because laches was not established by the lapse of time standing alone but depended also upon the inequity, if any, resulting from the lapse of time due to some change in the condition of the parties or property, or to some prejudice to the parties against whom the claim was to be enforced; and because any such determination must necessarily be based upon facts shown in evidence, laches did not appear, as a matter of law, on the face of the application.

We also held that, while ordinarily the equitable doctrine of laches may be invoked

only in a court of equity and in a proceeding wherein a party seeks affirmative equitable relief (and thus ordinarily would not be available as a defense to a statutory application for a refund in a probate court), nevertheless, at a hearing on an administrator's application for refund under the provisions of Section 465.400, the probate court and circuit court on appeal could properly consider the equitable defense of laches asserted against an administrator.

Upon remand, a hearing was had and evidence was adduced in the probate court which resulted in a judgment denying the application for refund. On appeal to the circuit court the matter was heard de novo and evidence, consisting of a stipulation of facts and the testimony of two witnesses, was again adduced. It is this evidence, of course, which has been included in the transcript on this appeal, and it is this evidence which we review in the instant case. Our statement of the evidence (including the testimony of the two witnesses and the stipulation of facts) includes those matters which in our view are decisive of this case.

Thomas P. Thomson, a bachelor, died intestate, April 6, 1932, leaving as his sole heirs two brothers and two sisters, viz., John, George, Margaret, and Nona Thomson. None of the brothers and sisters had ever married except George, whose childless wife predeceased him. On April 11, 1932, the brothers and sisters renounced their rights to administer and requested that Kopp be appointed. Margaret Thomson, one of the two witnesses at the instant hearing, testified that she was responsible for this request because of her absolute confidence in Kopp. On April 12, 1932, Kopp was appointed, qualified, and has acted as administrator continuously since.

The inventory listed personal property valued at $204,899.32. Various tracts of unvalued land in Kansas City, Missouri, were listed.

John J. Pryor filed suit in the circuit court on August 20, 1932, against Kopp as administrator, in which he sought a decree declaring that plaintiff and Thomson were partners during Thomson's lifetime, and that plaintiff recover from the estate profits due him from said partnership. No specific amount was prayed in the petition. The circuit court adjudged the existence of the partnership, ordered an accounting, and, after exceptions, affirmed the referee's report and, on September 22, 1934, entered judgment against the estate in the sum of $123,786.27 with six per cent annual interest from date and costs, and ordered that said judgment be classified as a claim in the probate court. Kopp appealed to this court, and, on May 4, 1938, the judgment was affirmed. Pryor v. Kopp, 342 Mo. 887, 119 S.W.2d 228. This court's mandate was filed in the circuit court on August 31, 1938. On September 29, 1938, when the claim represented by the affirmed judgment was, at least purportedly, allowed in probate court, its total was, including principal and interest, $155,229.79.

Subsequent to the time Pryor filed suit, and after the expiration of six months from Kopp's appointment and qualification as administrator, and on November 22, 1932, Kopp petitioned the probate court for an order of partial distribution. He averred that all demands had been paid except Pryor's claim in an undetermined amount, then pending in the circuit court; and he requested distribution of $50,000—$12,500 each to the four Thomson brothers and sisters; that after such distribution there would be a sum remaining in the estate in cash and available securities exceeding $125,000, sufficient to more than satisfy the Pryor claim. After a hearing, an order of distribution as prayed was entered, reciting that, after hearing evidence, the court was satisfied that, after the partial distribution requested, there would be sufficient money remaining to satisfy any further demand against the estate. The sum of $12,500 was paid to each brother and sister and the administrator took and was allowed credit therefor in his next annual settlement. No refunding bond was required or given by any distributee and no appeal was taken by anyone from the order of distribution.

As noted, there were some unvalued tracts of land listed in the inventory. In

March 1945, 35 of these vacant lots were sold by the administrator for a total of $900 and in May 1946, other lots were sold for $3,500. In both instances Margaret and Nona Thomson, then the only surviving heirs (George having died in 1937 and John in 1939) were personally served with the administrator's petition to sell and did not oppose the sale. The two remaining inventoried lots were acquired in 1948 by the Jackson County Land Trust for non-payment of taxes.

From November 3, 1938, through December 21, 1942, various amounts totaling $101,500 were paid on the Pryor claim. As of the date of trial, there was $22,286.27 principal due on the Pryor claim and in excess of $100,000 interest and the only asset remaining in the estate was cash in the sum of $6,011.23.

Margaret Thomson was executrix and sole beneficiary of George Thomson's estate (George Thomson died in 1937), and the inventory filed by her listed as an asset a one-fourth undivided interest in Thomas P. Thomson's estate, subject to the lien of an unpaid judgment then on appeal in the Supreme Court of Missouri.

Margaret Thomson testified. She was 74 at trial time. She had been graduated from business college when about 20 and thereafter had worked for 13 years as a stenographer and private secretary. She terminated her last employment about the beginning of World War I because of the illness of her mother. She took charge of the home in which her mother, sister, and brothers Thomas and John were living. After her mother's death, the two brothers and two sisters continued to live in the same home. Apparently living expenses were shared but, after the mother's death and until his death, Thomas contributed most of the money for living expenses. They lived "well" and "comfortably". After Thomas' death in 1932, George, who had been living in Chicago, returned to Kansas City and lived with his two sisters and his brother John. All contributed to the household expenses when able.

In the fall of 1932, Kopp, the administrator, called the Thomson sisters and brothers and arranged to meet them at a bank for the purpose of paying each $12,500. Margaret Thomson had not applied for or suggested the distribution and knew nothing of it until Kopp's call. Kopp gave each of them two checks, one for $10,000 and one for $2,500. Each endorsed his $2,500 check and returned it to Kopp to pay a Miss Gerdes "in settlement of a claim against the estate." Margaret deposited $7,500 in one bank and $2,500 in another. By reason of financial difficulties of the two banks shortly thereafter, she lost a total of $3,118.96. The $10,000 (other than that lost in the two banks) was spent by her for living expenses. She estimated that that particular $10,000 had been spent by about 1949 and before the time in 1950 when this proceeding was brought, except perhaps for a small amount. She was never notified by Kopp to return the money and her first knowledge that any demand was to be made on her for its return was when Kopp's application was filed in November 1950. Her standard of living did not change by reason of the receipt of the money from the Thomson estate but remained about the same. She was in fair physical condition until about 1949 or 1950 when a fall resulted in a badly injured ankle. She was unemployable at trial time and if required at this time to return the $12,500 she would be "destitute", and, in fact, she said she did not have $12,500 at trial time.

In addition to the money received from the partial distribution, she received, as sole distributee of her brother George's estate, about $8,000. Her brother John had owned the property in which the family had lived for about 20 years, and, in February 1933, he deeded it to Margaret. Through various transactions involving the sale and purchase of various homes, she acquired a duplex on The Paseo in Kansas City for $5,700 in 1941 and received from $50 to $62.50 per month for the part not used by her and her sister. She sold the duplex in 1951 for $17,450 and

deposited whatever remained, after capital gain tax, in a bank. Her sister Nona purchased property on Wornall for $3,500 (where the Thomson sisters now live) and, in November 1951, deeded an undivided one half to Margaret. Margaret conveyed to Nona a one-half interest in Margaret's bank account. The exact amount in that account in 1951 or the amount in that account at the time of trial was not shown. There was some testimony from which it could be inferred that the Wornall residence might be worth at trial time as much as $12,500. Margaret also received $1,000 as co-beneficiary of a life insurance policy in which her brother George was the insured.

Nona, the other sister, 69 at trial time, had formerly worked for about 21 years. Apparently she terminated her last employment in 1930 about two years before Thomas' death. She received the $12,500 under the same circumstances as her sister Margaret and, after returning to Kopp the $2,500, deposited $10,000 in a bank. She thereafter spent that money for living expenses and clothes, except for some specific items such as an attorney's fee in the sum of $1,900. She was of the opinion that she had exhausted the $10,000 by the period 1940–1943, and thought that most of it had been spent before 1938. She also received $1,000 as co-beneficiary of the life insurance policy above mentioned. She received $2,500 from an endowment policy which, together with the $1,000 from George's insurance, she used to purchase the Wornall residence. She had acquired 67 shares of Continental Oil Company stock during the 14 or 15 years she worked for that company, and sold it in 1949 or 1950. She, as did her sister, testified that she made no suggestion as to a partial distribution, did not ask Kopp to make the application, and knew nothing of it until she was called to receive the money. She also said that no suggestion was ever made to her by Kopp as to a possibility of having to refund the partial distribution. Her trial time assets were an undivided one half in the Wornall residence and in the bank account heretofore mentioned, which, as noted, was of an undetermined amount. She would have nothing left if required to refund $12,500.

The foregoing is a résumé of the evidence adduced at the hearing in the circuit court on the administrator's application for refund. It is significant that the administrator did not testify. We do not mention this in any critical sense, but we do conclude from that fact that anything to which he, as administrator, could testify was covered in the stipulation of facts. Thus, we must conclude that the sisters' testimony was true as to the circumstances of Mr. Kopp's appointment, as to the mechanics by which the distribution occurred, as to the fact that no request was made by either sister for a partial distribution, and as to the fact that no suggestion was made to them as to the possibility of the necessity for a refund by them and that their first knowledge of any such was at the time the application for refund was filed.

The burden to prove the laches of the administrator was on the respondents. The law as to the necessary elements for the application of laches is well settled. The difficulty is in determining whether the facts and circumstances of a particular case call for the application of the doctrine. We said in Kopp v. Thomson, supra, quoting from Pomeroy's Eq.Juris., 5th Ed., Pt. II, Ch. I, Sec. VIII, § 419d, p. 177: " 'While statements are to be found in some of the cases intimating that unreasonable delay, and mere lapse of time, independently of any statute of limitations, constitute a defense in a court of equity, the generally accepted doctrine appears to be that laches is not like limitation a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the condition or relations of the property or the parties. Where no one has been misled to his harm in any legal sense by the delay, and the situation has not materially changed, the delay is not fatal. Laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same

condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right.'" 246 S.W.2d 795[2]. And we also said at the same page, quoting from Blackford v. Heman Const. Co., 132 Mo.App. 157, 164, 112 S.W. 287, 290: "'It is certain that mere lapse of time alone is entirely without influence in those cases where the statute of limitations does not obtain.'" So that, *while it is clear that lapse of time alone* is not sufficient to establish laches, nevertheless, it is also clear that lapse of time is an important element of the doctrine. Schaeffer v. Moore, Mo., 262 S.W.2d 854, 860; Jones v. McGonigle, 327 Mo. 457, 467, 37 S.W.2d 892, 896[11-15], 74 A.L.R. 550. And each case involving the question of laches must necessarily be determined by its own facts and by the circumstances disclosed by the evidence in that particular case. Davies v. Keiser, 297 Mo. 1, 14, 246 S.W. 897, 900. "To lay down a rule for the application of laches to all cases is impossible. The doctrine is not applied mechanically and to every situation where there has been any neglect at all, but each case must stand on it own facts in that regard." Troll v. City of St. Louis, 257 Mo. 626, 661, 168 S.W. 167, 175. "'It is true that, by reason of their differences of fact, no one becomes an exact precedent for another, yet a uniform principle pervades them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him to now assert them.'" United States ex rel. Givens v. Work, 56 App. D.C. 330, 13 F.2d 302, 304, quoting Galliher v. Cadwell, 145 U.S. 368, 373, 12 S.Ct. 873, 875, 36 L.Ed. 738.

We think there can be no doubt that here two of the prerequisites to the application of the doctrine of laches are present, viz.: First,—a long lapse of time after the administrator had knowledge of his right to apply for, and knowledge of the necessity for, a refund, and ample opportunity to establish that right. Second,—no reasonable explanation by the administrator for the long and, if unexplained, unreasonable delay. The evidence shows that the administrator knew of the existence of the Pryor claim (although not its amount) at the time he obtained the order for partial distribution; that the administrator acted solely upon his own information and judgment in obtaining the order; that on September 22, 1934, he knew that the circuit court had rendered a judgment for an amount in excess of $123,000 with interest, and he knew if that judgment was affirmed on appeal the amount of the claim, because of the accrual of interest, would be much in excess of the amount for which the judgment was originally rendered; that he knew at all times of his right to proceed to obtain an order of refund pursuant to Section 465.400, supra; and that he must have known in 1934, or at least on this record in the absence of testimony by the administrator, he must be charged with knowledge, that there would be insufficient *assets to satisfy the Pryor claim. Having* knowledge of those facts, the administrator not only waited until March 9, 1950 (18 years after the partial distribution was made and 16 years after the circuit court judgment in the Pryor suit and 12 years after the affirmance of that judgment on appeal) to file his application for refund, but, in the interim, he failed to advise the Thomson heirs, either of the status of the Pryor claim and the amount of the remaining assets of the estate or of the necessity for a refund of the amounts they had received.

Appellant-administrator asserts that he could not have known until May 1946 (the date when the last of the inventoried lots

were sold) how much money would be in the estate available for application to the payment of the Pryor claim. The only evidence in the record, however, pertaining to this assertion is that lots were sold in 1945 for $900 and in May 1946 for $3,500. It is significant that there was no testimony by the administrator as to any fact which would cause him reasonably to believe that the proceeds from the sale of the lots would substantially increase the assets in the estate or increase those assets in an amount sufficient to satisfy the Pryor claim. That is to say, the administrator did not even testify that in his opinion the lots would sell for an amount sufficient to satisfy the Pryor claim. And there were no facts adduced which would support such a conclusion. Under these circumstances, the inference is compelled that the administrator must be charged with knowledge that the proceeds of the sale of the lots, irrespective of when sold, would not be sufficient to pay the Pryor claim. It appears, therefore, that the fact that the lots remained unsold was no excuse for his delay in filing the application for refund.

The difficult question in this case is whether the Thomson sisters were misled to their detriment and whether their situation and condition materially changed by reason of the administrator's delay. Has their condition become so changed by reason of the delay that they cannot be restored to their former positions if the administrator's right to require them to refund $12,500 each is enforced?

So far as we may determine from the record, neither of the Thomson sisters sought the partial distribution; neither had any knowledge, from the time of distribution until the time of the application for refund, of the financial status of the estate or of the status of the Pryor claim, or of even a possibility that they would be called upon to refund the amounts of their partial distributions. They each spent $2,500 of their respective distributions by endorsing checks in those amounts and returning them to the administrator for use in the settlement of a claim. While the question asked by the attorney for appellant included the statement that the $2,500 returned by each heir was to be used in the settlement of a claim against the *estate,* we think it apparent that a claim against the estate, as such, would not be handled in that manner. The record, other than as noted, fails to disclose or clarify the transaction whereby each heir turned back $2,500. We think, however, it is fairly inferable, in the absence of some explanation by Kopp, that the sisters each spent $2,500 through an arrangement made by him and that he was to some extent responsible for such disposition of these amounts.

But be that as it may, and whether we are dealing with prospective refunds of $12,500 or $10,000 by each sister, we are justified in believing that the remaining $10,000 was used, generally speaking, for the sisters' living expenses. Margaret lost some of her money due to bank liquidations, and Nona paid some specific legal expenses with part of hers. But, by and large, the record shows the money went for the purpose of maintaining their household and for items of clothing. Margaret testified that her expenditures continued over the period from 1932 until 1949, while Nona testified that probably most of her $10,000 had been expended prior to 1938.

Now, under some circumstances, the fact that one is required to return an amount of a partial distribution, even after a lapse of 18 years, would not be a sufficient basis for concluding that the delay had caused such a change in the legal status of the distributee as to make it inequitable to enforce the administrator's right to require a refund. That is to say, in one view, and under some circumstances, so long as one has received money upon condition that he will return it if it becomes necessary to use that money to pay creditors, it would seem that any use made of the money would be a conditional use and that mere dissipation of the fund in living expenses could not amount to a material change, in a legal sense, in the condition of the distributee.

We think, however, that the circumstances disclosed in this record are unusual.

The situation and condition of the Thomson sisters materially changed between 1934 or 1938 and 1950. We think it is reasonable to conclude, under all of the evidence, that the sisters were misled, in a legal sense, by the delay. During the years that intervened before the administrator filed his application, Nona had sold her 67 shares of Continental Oil Company stock; each had received $1,000 from an insurance policy on the life of their brother; *and they had made no attempt to earn money.* They had advanced in years from 49 and 54 respectively, in 1934, to 65 and 70 respectively, in 1950. During all this time they had been lulled into a sense of security by the administrator's delay, as a result of which they were prevented from so planning their modes of living as to be financially able to meet the contingency of having to return the $20,000 or $25,000. Even though we assume that Kopp was justified in applying for the partial distribution with knowledge of the existence of the Pryor claim in an undetermined amount, and even though we further assume that he had no reason to file an application for an order of refund until 1934 or 1938, and even though we further assume that, by that time, most of the particular funds which the sisters had received on distribution had been expended, still, during the years between 1934 or 1938 and 1950, had Kopp even suggested to them in 1934 or 1938 that some day they would be called on to refund this money (which must have been apparent to him in 1934 or 1938), the sisters could have, from 1934 or 1938, planned and lived with the necessity in mind of meeting that contingency when it arose.

■ As we have noted, no case involving the doctrine of laches is an exact precedent for another, and each case must be determined upon its own particular facts. We think that under the particular facts here, the sisters had reason to believe in good faith that any right the administrator had to call upon them for refund of the amounts of their partial distributions had been abandoned by him, and that, continuously during the period when this belief became progressively more fixed and certain, they had, in turn, progressively changed their conditions and situations so materially that to now permit the administrator to have an order of refund would amount to a deep-seated injustice to the sisters.

Respondents' pleading in the probate court, denominated a response to the application to require a refund, asserted defenses other than the administrator's laches. The judgment of the probate court adjudged all the issues made by the pleadings in favor of the sisters and against the administrator. This judgment was affirmed by the circuit court although, in a memorandum, the circuit court made it clear that the judgment was affirmed solely because the circuit court had sustained repondents' defense of laches. We affirm the judgment of the circuit court in so far as that judgment adjudicates that the administrator's laches bars him from asserting his right to an order of the probate court requiring a refund from Margaret K. and Nona E. Thomson.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.